IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

In re: CCA Recordings 2255 Litigation,

Petitioners,

v.

Case No. 19-cv-2491-JAR

(This Document Relates to Case No. 14-cr-20096-JAR-1, *United States v. Vicencio Olea-Monarez*, and Case No. 20-2051-JAR, *Vicencio Olea-Monarez v. United States*)

United States of America.

Respondent

---

## MEMORANDUM AND ORDER

This matter is before the Court on Petitioner Vicencio Olea-Monarez's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. § 2255 (Doc. No. 666).[1]  The Court previously denied one of the two grounds for relief Petitioner raised in his motion, but granted an evidentiary hearing on the remaining claim alleging ineffective assistance of counsel at the plea bargaining stage and at trial.[2]  The matter has been fully briefed and, after an evidentiary hearing, the Court is prepared to rule.  For the reasons explained below, the Court denies Petitioner's § 2255 motion.

---

[1] Unless otherwise specified, citations prefaced with "Doc." refer to filings and docket entries in the underlying criminal case, No. 14-20096-JAR-1.

[2] *Olea-Monarez v. United States*, No. 20-2051-JAR, Doc. 9.

## I.      Background

The Court assumes the reader is familiar with its previous ruling in this matter, which is incorporated by reference herein.  The Court does not restate the underlying facts and conclusions of law in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.

### A.      Procedural History

Petitioner was charged in a ten-defendant Superseding Indictment with conspiracy to possess with the intent to distribute more than 50 grams of methamphetamine (Count 1) and more than 1,000 marijuana plants (Count 2); distribution and possession with the intent to distribute methamphetamine (Counts 3, 5–9, 12, 15, 18–19, 21, 23–24); possession with the intent to distribute cocaine (Count 27); maintaining a residence for the purpose of storing, using, and distributing methamphetamine and cocaine (Counts 22, 26, 29); and possessing firearms in furtherance of a drug trafficking crime (Counts 25, 28).[3]  Count 1 carried a statutory mandatory-minimum term of ten years' imprisonment and a maximum term of life, and Counts 25 and 28 carried mandatory, consecutive sentences of at least five years.[4]  If convicted on both § 924(c) charges in Counts 25 and 28, Petitioner faced a mandatory, consecutive sentence of at least five years on the first § 924(c) conviction, and a mandatory, consecutive sentence of at least 25 years on the second § 924(c) conviction.[5]

---

[3] Doc. 47.

[4] *Id.* at 1–11; *see also* 18 U.S.C. § 924(c)(1)(A)(i); 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), and 846.

[5] *See* 18 U.S.C. § 924(c)(1)(C)(i) (2016).

On May 11, 2016, Petitioner was convicted by a jury on all charges.[6]  This Court sentenced Petitioner to life in prison plus 30 years.[7]  Petitioner filed a direct appeal, and the Tenth Circuit Court of Appeals affirmed.[8]  He has not filed a prior habeas motion under 28 U.S.C. § 2255.

Petitioner was detained at Corrections Corporation of America ("CCA") from September 2, 2014 to November 22, 2016, and was represented by Michael Clarke in the underlying proceedings.[9]  The Court appointed the Federal Public Defender ("FPD") to represent Petitioner in his § 2255 proceedings on July 17, 2018.[10]  On February 5, 2020, the FPD filed this § 2255 motion on Petitioner's behalf, setting forth two grounds for relief: the government violated the Sixth Amendment by intentionally and unjustifiably intruding into his attorney-client relationship, and trial counsel was constitutionally ineffective during the plea-bargaining stage and at trial.  In an August 10, 2022 Memorandum and Order, the Court denied Petitioner's Sixth Amendment intentional intrusion claim.[11]  With respect to the ineffective-assistance-of-counsel claim, the Court determined that the circumstances surrounding counsel's advice regarding Petitioner's rejection of a 25-year plea agreement in favor of presenting a duress defense at trial warranted an evidentiary hearing.  The Court set the matter for hearing on the issue of whether

---

[6] Doc. 313.

[7] Doc. 396.  This sentence consists of life imprisonment on Counts 1, 2, 3, 5, 6, 8, 9, 12, 15, 18, 19, 21; 40 years' imprisonment on Counts 7 and 23; 20 years' imprisonment on Counts 22, 24, 26, 27, and 29; all counts to run concurrently.  The sentence for the firearms convictions in Count 25 is 60 months' imprisonment consecutive to all other counts and the sentence for Count 28 is 25 years' imprisonment consecutive to all other counts. *Id.* at 3.

[8] *United States v. Olea-Monarez*, 908 F.3d 636 (10th Cir. 2018).  On appeal, Petitioner argued that the Court's responses to the questions sent from the jury during deliberations were erroneous and required reversal of his conviction on Count 8; the Tenth Circuit disagreed.  *Id.* at 638, 640–43.

[9] CCA was subsequently renamed CoreCivic and was shuttered in December 2021.

[10] Standing Order 18-3.

[11] *See Olea-Monarez v. United States*, No. 20-2051-JAR, Doc. 9 at 13–16.

counsel provided effective assistance of counsel when he advised Petitioner to (1) reject the plea

offer and (2) instead present the duress defense at trial.

At the evidentiary hearing on April 11, 2023, Petitioner did not testify and called one

witness: his trial counsel, Clarke.  The government did not offer witnesses.  Both parties

submitted exhibits the Court has reviewed.  The following facts are adduced from the testimony

and evidence presented at the hearing.

### B.      The Government's Rule 11(c)(1)(C) Plea Offer

Petitioner told Clarke that he wanted him to negotiate the best deal possible on his behalf

with the government.  Before trial, Clarke offered the government a Rule 11(c)(1)(C) binding

plea agreement to a 20-year sentence.  The government rejected this offer and on December 15,

2015, countered by offering Petitioner a Rule 11(c)(1)(C) binding plea agreement to a 27-year

sentence on Counts 1 and 2, in exchange for the government dismissing the other counts,

including the firearms charges.[12]  In extending the offer, Assistant United States Attorney

("AUSA") David Zabel noted that, by his calculation, Petitioner was most likely looking at a life

sentence, even with a three-level reduction for acceptance of responsibility.[13]

Clarke, who was in a serious motorcycle accident that fall, did not reply to AUSA

Zabel's numerous email inquiries about whether Petitioner would accept the 27-year plea deal.

On March 15, 2016, AUSA Zabel sent Clarke an email stating that since he had not heard back

from Clarke about the offer, he assumed Petitioner had rejected it, and offered instead a second

plea deal to a 25-year binding plea.[14]  Clarke responded the next day that he communicated the

27-year offer to Petitioner, who said no, and that he would communicate the 25-year option to

---

[12] Ex. 817.

[13] *Id.*

[14] Ex. 822.

him.[15]  Clarke further stated that, "[g]iven [Petitioner's] age, I think coming to an agreement will be extremely difficult."[16]  After consulting with Clarke, Petitioner ultimately rejected the 25-year offer and proceeded to trial.

Petitioner's co-defendants all entered guilty pleas.[17]  Prior to the commencement of trial on April 20, 2016, the Court held a *Lafler-Frye* hearing after Petitioner declined the government's plea offer.[18]  At this hearing, Petitioner stated that he knew the government had offered him a plea agreement calling for a sentence of 25-years' imprisonment, and it was Petitioner's decision not to accept the offer.

### C.       The Duress Defense and its Aftermath

Trial began on April 20, 2023.  At the conclusion of the government's evidence and prior to Petitioner testifying, the Court took up the issue of Petitioner's intention to pursue a duress defense.[19]  That defense requires: (1) an immediate threat of death or serious bodily injury; (2) a well-grounded fear that the threat will be carried out; and (3) no reasonable opportunity to escape the threatened harm.[20]  The right to present this affirmative defense is not absolute, and the court "must refuse to issue a duress-defense instruction when the defendant fails to make 'a threshold showing' of duress sufficient to place the defense in issue."[21]

---

[15] *Id.*

[16] *Id.*

[17] *See* Doc. 666 at 52–55.

[18] Doc. 439 at 3–6.

[19] Doc. 450 at 192.  The transcripts of the April–May 2016 jury trial consist of 15 volumes found at Docs. 439–453 and collectively consist of 1926 sequentially paginated pages.  For convenience, the Court cites to these documents by ECF docket entry number, followed by a reference to the page number in the transcript that appears in the upper right corner of each page.

[20] *United States v. Beckstrom*, 647 F.3d 1012, 1016 (10th Cir. 2011); 10th Cir. Crim. Pattern Jury Instr. No. 1.36.

[21] *United States v. Dixon*, 901 F.3d 1170, 1177 (10th Cir. 2018) (quoting *United States v. Scott*, 901 F.2d 871, 873 (10th Cir. 1990)).

After Clarke stated what he understood to be the elements of the defense and proffered what Petitioner would testify to, AUSA Zabel asked the Court to exercise its gatekeeping function prior to allowing Petitioner to testify.[22]  The government's objection focused on the third element, arguing that there was no evidence that Petitioner was in immediate threat of death or great bodily harm, and thus the Court should not permit him to present the defense and/or give the duress jury instruction based only upon a theory.[23]  The Court acknowledged its gatekeeping function, but took the matter under advisement until Petitioner testified, explaining that it would not prevent him from testifying about a duress defense if he chose to do so.[24]  The Court then recessed for the weekend to allow Petitioner time to confer with Clarke about his decision to testify.

Petitioner ultimately decided to testify and the Court conducted a colloquy with him regarding his Fifth Amendment right not to do so.[25]  Petitioner confirmed that he discussed the benefits of testifying versus the benefits of not testifying with Clarke.[26] This Court also explained that "the government's attorney will be able to ask you questions about what you testify about," which Petitioner affirmed he understood.[27]  Petitioner also confirmed that he understood he could make a decision that was contrary to Clarke's advice and that ultimately the

---

[22] Doc. 450 at 194–197.

[23] *Id.* at 197–204.

[24] *Id.* at 208–215.

[25] *See generally* Doc. 451.

[26] *Id.* at 3.

[27] *Id.* at 4.

decision whether to testify was his to make.[28]  This Court reiterated that it would not decide whether to give a duress instruction until it heard Petitioner's testimony.[29]

Petitioner proceeded to testify that he engaged in various criminal acts, including the distribution of methamphetamine;[30] that he began selling drugs for co-defendant Lopez in order to satisfy an outstanding drug debt left behind by his brother, who had recently died of cancer;[31] that he engaged in this criminal conduct only because he feared for his own safety and the safety of his family if he refused;[32] and that although he could have and wanted to contact the police instead of "working for [Mr.] Lopez," he chose not to because he believed the police would be unable to protect him and his family.[33]

At the final jury instruction conference, the Court heard from both parties regarding whether Petitioner had presented sufficient evidence for the Court to issue the duress-defense instruction to the jury.[34]  The Court ruled that he had, and Instruction No. 29 provides:

> The defendant claims that if he committed the crimes charged in the indictment, he did so only because he was forced to commit the crimes.  If you conclude that the government has proved beyond a reasonable doubt that the defendant committed the crimes as charged, you must then consider whether the defendant should nevertheless be found "not guilty" because his actions are excusable because they were performed under duress or coercion.
>
> If you find that the defendant committed the crimes as charged, his actions are justified by duress or coercion only if you find that he has proven the following three elements:

---

[28] *Id.* at 3–4.

[29] *Id.* at 12.

[30] Doc. 342 at 36–38, 82, 222.

[31] *Id.* at 22, 24, 30.

[32] *Id.* at 32–33.

[33] *Id.* at 46.

[34] Doc. 452 at 11–13.

> _First:_ The defendant was under an unlawful and present, imminent
> and impending threat of such a nature as to induce a well-grounded
> apprehension of death or serious bodily injury to himself or a
> family member or others[;]
>
> _Second:_ The defendant had no reasonable, legal alternative to
> violating the law, that he had no chance both to refuse to do the
> criminal act and also to avoid threatened harm; and
>
> _Third:_ A direct causal relationship could have been reasonably
> anticipated between engaging in the criminal action and avoiding
> the threatened harm.
>
> The defendant must prove each of these elements by a
> preponderance of the evidence. To prove a fact by a
> preponderance of the evidence means to prove the fact is more
> likely so than not so. This is a lesser burden of proof than to prove
> a fact beyond a reasonable doubt.[35]

On May 11, 2016, Petitioner was convicted by the jury on all charges.[36]  At sentencing on

November 2, 2016, the Court overruled and denied Petitioner's motion for judgment of acquittal, finding

there was sufficient evidence to support a conviction and that a reasonable jury could find Petitioner's

duress defense not credible or based on a preponderance of the evidence.[37]  The Court also overruled

Petitioner's objection to a two-level enhancement for obstruction of justice, stating:

> I have no question in my mind at all that Mr. Olea-Monarez
> testified falsely and he intentionally testified falsely and he
> committed perjury such that [the obstruction-of-justice]
> enhancement is justified. He repeatedly attempted to lay all of this
> on the shoulders of his brother, Federico, at least drug trafficking
> for some period of time and his brother being kind of a big fish, his
> brother dying. And that all he was doing was trying to tie up loose
> ends and pay off the debt so that his family wouldn't be hurt.
> That's the story he told repeatedly.
>                    . . .
>
> So I find that the testimony by Mr. Olea-Monarez, it wasn't just
> inconsistent, it wasn't just the product of him being rattled on

---

[35] Doc. 312 at 42.

[36] Doc. 313.

[37] Doc. 454 at 19.

cross[-]examination.  It was the product of him lying, of him
intentionally telling lies to try to explain away all of this significant
and voluminous evidence against him by laying it on the soul of
his poor dead brother, by, you know, claiming that he was, you
know, running for his life when all of his behavior suggests
otherwise.[38]

The Court then sentenced Petitioner to life in prison plus 30 years.[39]

### D.    Trial Counsel's Testimony

Petitioner appended a Declaration from Clarke to his § 2255 motion dated January 27,

2020.[40]  Clarke states that he did not encourage Petitioner to take the 25-year plea offer and that

his general policy "was to take a case to trial unless the government is willing to offer less than

20 years." [41]  Clarke further averred that it was his idea to pursue a duress defense; that he

believed Petitioner when he said he did not go to the police because he believed they would be

unwilling or unable to protect his family in Mexico; that he researched the law on the

requirements of a duress defense and knew that Petitioner would have to present more than his

subjective belief regarding police protection; and that he located news stories about the Mexican

cartel but does "not remember" whether he offered this information into evidence at trial.[42]

Clarke does not recall whether he discussed with Petitioner the possibility that he might receive

an obstruction-of-justice enhancement if he testified falsely at trial.[43]

At the April 11, 2023 evidentiary hearing, however, Clarke pushed back on questioning

from the FPD about certain statements in his Declaration, which he pointed out had been drafted

---

[38] *Id.* at 47, 51–52.

[39] Doc.  396.

[40] Ex. 404.

[41] *Olea-Monarez v. United States*, No. 20-2051-JAR-JPO, Doc. 3-7 ¶ 4.

[42] *Id.* ¶¶ 5, 8, 9, 10, 11.

[43] *Id.* ¶ 12.

by the FPD for him to sign.  First, Clarke stressed that he did not have a bright- line rule to take a case to trial unless the government was willing to offer his client less than 20 years because he does not make the decision whether or not to go to trial—the client does.  He explained that he believes people have a difficult time grasping conceptually sentences of 20 years or more, which is hard for them to accept.  Clarke stated that this was not the language he would have used if he had drafted the Declaration, but conceded that he never asked the FPD to revise or clarify this statement in paragraph 4.  He further testified that he told Petitioner that he was facing a possible life sentence. While he did not encourage Petitioner to take the 25-year deal, Clarke did not discourage him taking the offer, nor did he tell him that the jury was likely to acquit him.

With respect to his responsiveness to AUSA Zabel's emails, the parties stipulated that Clarke met with Petitioner in person at CCA at least 19 times, and took handwritten notes at each meeting.[44]  The record shows that Clarke met with Petitioner at least four times between December 2015 and March 2016 and confirms Clarke's testimony that his lack of response to Zabel did not necessarily reflect inattention to Petitioner's case.  Specifically, Clarke's notes from a meeting on January 4, 2016, reflect that Petitioner rejected the 27-year offer, and wanted to counter with a ten-year offer with another five years off for cooperation, and no deportation.[45]  Notes from a meeting on February 12, 2016 reflect that Petitioner would accept a ten-year deal but would not testify.[46]  February 26, 2016 notes reflect that Petitioner had reviewed and was

---

[44] Exs. 824–837, 842, 867.  The government noted that several meetings appear in Petitioner's production log, Ex. 823.

[45] Ex. 832.

[46] Ex. 833.

frustrated by proffers from his co-defendants.[47]  And on March 23, 2016, Clarke gave Petitioner additional proffers and they discussed the 25-year offer from the government.[48]

With respect to the duress defense, Clarke testified that it was his understanding of Tenth Circuit law that if he was able to persuade this Court to give the duress instruction, the jury would have been free to acquit Petitioner based on his testimony alone, if they believed his testimony.  He explained that he believed the duress defense was Petitioner's only chance for acquittal at trial based on the nature and amount of evidence against him.  Clarke admitted this was the first and only time he has presented a duress defense and that he does not recall what research he did before trial.  He was aware that Petitioner would have to offer more than his subjective belief that going to law enforcement would have been illusory or futile, that common knowledge was not sufficient to satisfy the objective prong of that element, and that he talked to some friends who were immigration law attorneys.  He acknowledged that he downloaded or saved screenshots from articles about Mexican drug cartels during the trial, but stressed that does not necessarily mean it was the first time he read or looked at the articles.[49]  Clarke did not present any objective or expert evidence at trial that would support Petitioner's testimony that going to law enforcement would have been illusory or futile.  He further testified that while it was his idea to present the duress defense, he did not advise Petitioner that he had a good chance of being acquitted based on that defense and that Petitioner's strongly-held beliefs about the defense were an impediment to reaching a plea agreement with the government.  Clarke does not recall the details of his discussion with Petitioner about the risks and benefits of testifying or that he would be subject to a possible obstruction enhancement if he did not testify truthfully.

---

[47] Ex. 834.

[48] Ex. 836.

[49] Exs. 401, 408, 424, 425.

After the jury's guilty verdict but before his sentencing hearing, Petitioner sent this Court a letter in which he continued to advocate that his drug trafficking conduct was the result of duress, arising from his late brother's drug debt.[50]  Petitioner wrote:

> Out of fear, I made the mistake of agreeing to their terms, resulting in my present dilemma.  After doing what they asked and of seeing hundred [sic] of thousand dollars passing through my hands daily, I thought for sure that I far exceeded in paying my brothers debt off.  But these people were relentless and ruthless in their business. They threatened to hurt not only me, but my immediate family as well.  I had to quit my job and work for them full-time.  Yes, I earned a little money on the sided [sic] for my services, I even risked stealing some of the money that passed through my hand on a daily.  But in no way, irregardless [sic] of the amount of easily obtained  money, was I willing and wanting to partake in this enterprise.  I just didn't see no out without the threat of my loved ones and myself being killed by these individuals.  So I worked until the law came and rescued me from this nightmare.[51]

Similarly, notes from an October 25, 2016 meeting with Clarke prior to sentencing reflect that Petitioner continued to insist that he was compelled to do co-defendant Lopez's bidding.

## II.     Legal Standard

A successful claim of ineffective assistance of counsel must meet the two-pronged test set forth in *Strickland v. Washington*.[52]  First, a defendant must show counsel's performance was deficient in that it "fell below an objective standard of reasonableness."[53]  Second, a defendant must show his counsel's deficient performance actually prejudiced his defense.[54]  The Supreme Court has held the two-part *Strickland* test applies to the plea-bargaining stage.[55]  If a defendant

---

[50] Ex. 844.

[51] *Id.* at 2.

[52] 466 U.S. 668 (1984).

[53] *Id.* at 688.

[54] *Id.* at 691–92.

[55] *Lafler v. Cooper*, 566 U.S. 156, 162–63 (2012) (citing *Hill v. Lockhart*, 474 U.S. 52, 58 (1985)).

received ineffective advice causing him to reject a favorable plea deal and proceed to trial, resulting in a much harsher sentence, he is entitled to relief under § 2255.[56]

To prevail on *Strickland*'s performance prong, a defendant "must show 'that counsel's representation fell below an objective standard of reasonableness.'"[57]  There is "a strong presumption that counsel provided effective assistance."[58]  "A fair assessment of attorney performance requires" the court to make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."[59]  "[T]o show that his counsel was deficient, [defendant] must demonstrate that the errors were so serious that 'counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'"[60]

"The Supreme Court has recognized the deficient performance prong 'is necessarily linked to the practice and expectations of the legal community' as well as the 'prevailing norms of practice as reflected in American Bar Association standards and the like.'"[61]  Counsel has a "critical obligation . . . to advise the client of 'the advantages and disadvantages of a plea agreement.'"[62]  Further, counsel's "ignorance of a point of law that is fundamental to his case

---

[56] *See In re Graham*, 714 F.3d 1181, 1182 (10th Cir. 2013) (per curiam) (citing *Lafler*, 566 U.S. at 174).

[57] *United States v. Moya*, 676 F.3d 1211, 1213 (10th Cir. 2012) (quoting *Strickland*, 466 U.S. at 688).

[58] *United States v. Holloway*, 939 F.3d 1088, 1103 (10th Cir. 2019) (quoting *United States v. Kennedy*, 225 F.3d 1187, 1197 (10th Cir. 2000)); *see also Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential.").

[59] *Strickland*, 466 U.S. at 689.

[60] *Hanson v. Sherrod*, 797 F.3d 810, 826 (10th Cir. 2015) (quoting *Strickland*, 466 U.S. at 687).

[61] *United States v. Kearn*, 578 F. Supp. 3d 1221, 1231 (D. Kan. 2022) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010)).

[62] *Padilla*, 599 U.S. at 370 (quoting *Libretti v. United States*, 516 U.S. 29, 50–51 (1995)).

combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*."[63]

*Strickland*'s prejudice prong requires a defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[64]  "In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice."[65]  When, as in this case, a defendant alleges ineffective assistance led him to reject a plea offer, a defendant must establish that "but for the ineffective advice of counsel there is a reasonable probability" that:

> [1] defendant would have accepted the plea[,] . . . [2] the prosecution would not have withdrawn it in light of intervening circumstances[,] . . . [3] the court would have accepted its terms, and . . . [4] the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.[66]

 "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[67]  This standard "does not require that the [defendant] show that 'counsel's deficient conduct more likely than not altered the outcome in the case.'  However, mere speculation is not sufficient to satisfy this burden."[68]

A petitioner must demonstrate both of the *Strickland* prongs to establish a claim of ineffective assistance of counsel, and failure to prove either is dispositive.[69]  "The performance component need not be addressed first. 'If it is easier to dispose of an ineffectiveness claim on

---

[63] *Hinton v. Alabama*, 571 U.S. 263, 274 (2014).

[64] *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quoting *Strickland*, 466 U.S. at 694).

[65] *Id.*

[66] *Kearn*, 578 F. Supp. 3d at 1232 (quoting *Lafler*, 566 U.S. at 164).

[67] *Strickland*, 466 U.S. at 694.

[68] *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011) (quoting *Strickland*, 466 U.S. at 693).

[69] *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'"[70]

## III.   Discussion.

Petitioner asserts that Clarke provided ineffective assistance of counsel at both the plea-bargaining stage and at trial.  He contends that, but for counsel's deficient performance, there exists a real probability that he would have made a different choice and accepted the 25-year plea offer and not proceeded to trial.  Alternatively, Petitioner argues that he would have been convicted of fewer offenses, received a shorter sentence, or both.  As discussed below, the Court finds that Petitioner has not met his burden on his ineffective-assistance of counsel claim.

### A.   Plea-bargaining Stage

In the plea agreement context, counsel has a "critical obligation . . . to advise the client of 'the advantages and disadvantages of a plea agreement.'"[71]  Petitioner argues that Clarke was required to advise him that the available evidence against him was overwhelming, that there was no viable defense Clarke could pursue at trial, including the duress defense, and that accepting the government's 25-year offer was the only way to avoid a life sentence.  In his unsworn § 2255 motion, Petitioner asserts that he wanted to accept the government's 25-year plea offer but Clarke convinced him not to, noting Clarke's statement in his Declaration that it was his policy not to accept any plea offers of 20 years or more.  Petitioner claims that Clarke informed him that he had a strong duress defense and advised him to proceed to trial on that basis.

---

[70] *Id.* (quoting *Strickland*, 466 U.S. at 697); *see also Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir. 2001) ("This court can affirm the denial of habeas relief on whichever *Strickland* prong is the easier to resolve.").

[71] *Padilla v. Kentucky*, 559 U.S. 356, 370 (2010) (quoting *Libretti v. United States*, 516 U.S. 29, 50–51 (1995)).

At the evidentiary hearing, however, Petitioner did not testify about his version of events. The only witness was Clarke, whose testimony offers a contrary version of events leading up to Petitioner's rejection of the government plea offers: that Clarke met in person with Petitioner numerous times while he was detained at CCA; that Petitioner told Clarke that he wanted Clarke to negotiate the best deal possible; that Petitioner offered to plead to 20 years, but had several conversations with Clarke about a 10-year deal; that Clarke reviewed the proffer agreements of testifying co-defendants and the government's evidence with Petitioner; that Clarke discussed the potential sentencing exposure with Petitioner and explained that a life sentence was possible; that Clarke communicated the advantages of the 25-year binding plea offer to Petitioner, but did not encourage him to take the deal because he wanted Petitioner to make his own decision based on the information provided; and that ultimately, it was Petitioner, not Clarke, who made the decision to reject the government's offer.

Based on this record, the Court concludes that Petitioner has not presented sufficient evidence that Clark's performance fell below an objective standard of reasonableness. The Court "remain[s] suspicious of bald, post hoc and unsupported statements that a defendant would have [pled guilty] absent counsel's errors."[72] "Absent a showing to the contrary," the Court presumes that "an attorney's conduct is objectively reasonable because it could be considered part of a legitimate trial strategy."[73] Thus, "[c]ounsel's performance must be 'completely unreasonable' to be constitutionally ineffective, not 'merely wrong'."[74]

---

[72] *United States v. Chavarin*, No. 21-4105, 2023 WL 2706696, at *3 (10th Cir. Mar. 30, 2023) (second alteration in original) (quoting *Heard v. Addison*, 728 F.3d 1170, 1184 (10th Cir. 2013)).

[73] *Id.* (quoting *United States v. Babcock*, 40 F.4th 1172, 1177 (10th Cir. 2022)).

[74] *Wilson v. Sirmons*, 536 F.3d 1064, 1083 (10th Cir. 2008) (quoting *Hoxie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997)).

After considering Clarke's testimony, the Court finds that his representation of Petitioner was objectively reasonable.  Clarke communicated the advantages of the 25-year plea offer to Petitioner, who understood the terms of the agreement.  It was Petitioner, not Clarke, who made the decision to reject the government's offer.  Clarke testified that he did not need to convince Petitioner not to take the plea deal because Petitioner consistently and repeatedly informed him that he was not interested in any of the government's offers.  Nor does the evidence support Petitioner's claim that Clarke informed him that he had a strong duress defense and essentially pushed him to proceed to trial on that basis.  In fact, Petitioner continued to assert after the verdict that he was subject to duress, as evidenced by the letter he sent to the Court after trial.  Because Petitioner has not shown that Clarke's performance during the plea-bargaining stage was completely unreasonable, the Court concludes that Clarke's legal advice was not deficient.

Although the government does not dispute Petitioner's ability to satisfy the prejudice prong of his claim, failure to prove the performance prong is dispositive.  Petitioner's claim is denied on this ground.

### B.    Trial

Petitioner claims that Clarke knew Petitioner would be unable to present a duress defense unless he could first show that the alternative of contacting law enforcement was illusory or futile, and that he should have known that Petitioner's conclusory allegations and general evidence would not satisfy this requirement. [75]  Petitioner further claims that although Clarke located news stories about the dangerousness of the Mexican cartel, he did not present that evidence, or any other specific reasons to doubt that the law enforcement alternative was viable,

---

[75] *See United States v. Beckstrom*, 647 F.3d 1012, 1016–17 (10th Cir. 2011) (holding defendant bears the burden of proving three elements of a duress defense by a preponderance of the evidence: "(1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) no reasonable opportunity to escape the threatened harm." (quoting *United States v. Scott*, 901 F.2d 871, 873 (10th Cir. 1990))).

at trial, instead relying solely on Petitioner's vague and wholly uncorroborated testimony. He claims that Clarke's deficient performance substantially prejudiced him because his conviction resulted in a life sentence.

Because it is the easier question to resolve on this claim, the Court starts with the prejudice prong. In the context of a trial, *Strickland*'s prejudice prong requires a defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[76] Petitioner has failed to meet this burden.

Given the overwhelming amount of evidence arrayed against Petitioner at the two-week trial—which included testimony from several co-defendants—it is highly unlikely that the result of trial would have been different had counsel persuaded Petitioner not to testify and offer the duress defense. Petitioner offers no viable alternative defense strategy that Clarke could have employed once he rejected the government's plea offer. Indeed, a duress defense is not absolute and Clarke successfully persuaded this Court to open the gate to Petitioner's only realistic path to an acquittal.

Unfortunately for Petitioner, his false testimony resulted in a two-level enhancement for obstruction of justice. This additional two levels, however, did not impact the life sentence calculation. The PSIR calculated Petitioner's adjusted offense level at 48, which was treated as the maximum total offense level of 43.[77] Even without the additional two levels for obstruction of justice, Petitioner's adjusted offense level would have been 46, and his total offense level would have remained 43. With a criminal history category I, the Guideline range remained at

---

[76] *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

[77] Doc. 388 ¶¶ 108, 111.

life imprisonment.[78]  Accordingly, Petitioner has not met his burden on the prejudice prong and this claim is denied.

### C.    Sixth Amendment Intentional Intrusion Claim

Finally, the Court briefly revisits its ruling denying Plaintiff's Sixth Amendment intentional intrusion claim.  Petitioner's § 2255 motion falls under the category of claims alleging Sixth Amendment violations that occurred post-conviction but before sentencing.[79]  After the Court denied Petitioner's claim, the Tenth Circuit Court of Appeals affirmed this Court's decision in another § 2255 proceeding raising a similar Sixth Amendment violation claim.  In *United States v. Orduno-Ramirez*, the Tenth Circuit declined to categorically extend a conclusive presumption of prejudice to post-plea or -conviction intrusions into attorney-client communications.[80]  After noting this Court held that the petitioner must show prejudice in such cases, the Tenth Circuit did "not decide which party bears the burden because the Government has shown that Mr. Orduno-Ramirez has not been prejudiced, and he does not contend otherwise,"[81]  Nevertheless, the court found that the government showed that the intrusion did not cause Mr. Orduno-Ramirez prejudice, and Orduno-Ramirez did not contend that he was prejudiced, relying instead on the presumption of prejudice in *Shillinger*.[82]  The court found that the government showed that the lead prosecutor did not view the videos, the soundless video

---

[78] *Id.* ¶ 143.

[79] *Olea-Monarez v. United States*, No. 20-2051-JAR, Doc. 9 at 14.

[80] 61 F.4th 1263, 1273–77 (10th Cir. 2023) (discussing *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995)).

[81] *Id.* at 1276.

[82] *Id.* at 1277.

recordings provided no strategic value to the prosecution, and the record reveals no irregularity in the petitioner's sentencing proceedings.[83]

The Tenth Circuit also denied Orduno-Ramirez's request to order supplemental briefing on the burden of proof question.[84]  In a separate related case on appeal, however, the court recently agreed to address issue of "[w]hether the district court erroneously required [Petitioner] to demonstrate prejudice to establish his Sixth Amendment claim."[85]

Although the question of whether the petitioner must show prejudice or whether the government must show lack of prejudice is an open question, the Court reaffirms its finding in this case that Petitioner has not been prejudiced.  While the Court and the government assumed that Petitioner bore the burden to show prejudice resulting from the intentional intrusion into his attorney-client communications, the government introduced evidence and arguments showing that he suffered no prejudice.  As was the case in *Orduno-Ramirez*, the government submitted an affidavit from AUSA Zabel stating that at no time during his involvement in the case, including prior to sentencing, did he view or become privy to any video recordings of Petitioner at CCA.[86] The government also argued that because Petitioner had not identified "any snippet on any video in his case where the content of discussions relating to legal advice or strategy is discernable or ascertainable by any viewer of the video," the recordings provided no strategic value to the prosecution.[87]  And finally, the government noted that Petitioner faced a life sentence on multiple counts of conviction and mandatory consecutive terms of imprisonment on the § 924(c) charges.

---

[83] *Id.*

[84] *Id.* at 1277 n.24.

[85] *United States v. Valdez*, No. 22-3025 (10th Cir. Sept. 12, 2023).

[86] *Olea-Monarez v. United States*, No. 20-2051-JAR, Doc. 4-1.

[87] *Id.*, Doc. 4 at 19.

The Court agrees that none of the information the Court, the United States Probation Office, or the government relied on for sentencing could have come from the video recordings. As noted in the Court's previous order, the recorded meetings between Petitioner and Clarke took place prior to trial, but the government did not have possession of or access to the recordings until after trial was over.[88]   Each of the sentencing enhancements was calculated based on evidence presented at trial, which was not tainted by the purported intrusion.   Thus, even assuming the government bears the burden of proving lack of prejudice, it has met that burden because the record reveals no irregularity in or threat to the reliability or fairness of Petitioner's sentencing proceedings.   Because the government has shown the intrusion did not cause prejudice—and Petitioner does not contend that he was actually prejudiced—there is no Sixth Amendment violation and no ground for relief under § 2255.[89]

## IV.     Certificate of Appealability

Rule 11 of the Rules Governing Section 2255 Proceedings states that the Court must issue or deny a certificate of appealability ["COA"] when it enters a final order adverse to the applicant.   "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[90]   To satisfy this standard, the movant must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[91]   For the reasons stated above, the Court finds that Petitioner has not made this showing and, therefore, denies a certificate of appealability as to its ruling on his § 2255 motion.

---

[88] *Id.*, Doc. 9 at 14.

[89] *United States v. Orduno-Ramirez*, 61 F.4th 1263, 1266 (10th Cir. 2023).

[90] 28 U.S.C. § 2253(c)(2).

[91] *Saiz v. Ortiz,* 392 F.3d 1166, 1171 n.3 (10th Cir. 2004) (quoting *Tennard v. Dretke,* 542 U.S. 274, 282 (2004)).

**IT IS THEREFORE ORDERED BY THE COURT** that Petitioner Vicencio Olea-Monarez's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. § 2255 (Doc. 666) is **denied** on both his Sixth Amendment intentional intrusion claim and on his claim of ineffective assistance of trial counsel at the plea stage and at trial.  Petitioner is also denied a COA.

**IT IS SO ORDERED.**

Dated: October 2, 2023

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE
